### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ACE OILFIELD RENTALS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-15-672-D |
| ) | |
| WESTERN DAKOTA WELDING ) | |
| AND FABRICATION, LLC, ) | |
| DOUG KERKVLIET, ) | |
| TUCKER PANKOWSKI, and ) | |
| WESDAK WELDING AND ) | |
| DIESEL, LLC, ) | |
| ) | |
| Defendants. ) | |

### **ORDER**

Before the Court is Plaintiff Ace Oilfield Rentals, LLC's ("Ace") Partial Motion for Summary Judgment as to Defendant Doug Kerkvliet [Doc. No. 110]. After the deadline to file a response brief passed, Mr. Kerkvliet filed a document that purported to be a response to Ace's Motion [Doc. No. 116]. The Court struck the response because it was untimely and failed to comply with FED. R. CIV. P. 56(c) or LCvR56.1 [Doc. No. 117]. Mr. Kerkvliet then filed a combined response and cross-motion for summary judgment [Doc. No. 119]. The Court again struck the response and cross-motion because it was untimely and failed to comply with Rule 56(c) or LCvR56.1 [Doc. No. 121]. Mr. Kerkvliet has therefore failed to respond to Ace's Motion within the deadline set by LCvR7.1(g) or in the manner required by Rule 56(c) or LCvR56.1.

Accordingly, in the exercise of discretion under LCvR56.1(e), the Court deems admitted all material facts presented in support of Ace's Motion. Under Rule 56, however,

the Court has an independent duty in the absence of a response by the nonmoving party to determine that summary judgment is appropriate. *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1200 (10th Cir. 2002); *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). Applying this standard, the Court finds that the Motion should be granted in part.

## FACTUAL BACKGROUND

Ace sells and leases trailer-mounted hydraulic catwalks for drilling activities for oil and gas wells. In early 2013, Ace designed its HydraCat, a piece of equipment used to deliver drill pipe to the drilling platform of a rig. Ace then modified and improved the design of the HydraCat in mid-2013. The modifications allowed the HydraCat to operate in a safer and more efficient manner than other hydraulic catwalks. On April 29, 2013, Plaintiff entered into a Manufacturing Agreement with Western Dakota for the manufacture and construction of the HydraCat. At the time, Mr. Kerkvliet owned 51% of Western Dakota and Mr. Pankowski owned the remainder.

The Manufacturing Agreement provided that Ace would use Western Dakota as its sole manufacturer of the HydraCat. In exchange, Western Dakota agreed not to disclose Ace's confidential information, which was defined to include technological, product, and customer information. The Manufacturing Agreement also included a non-compete clause precluding Western Dakota from engaging in the same or similar business as Ace. The non-compete clause further prohibited Western Dakota from communicating with Ace's

customers or prospective customers and required Ace's written permission before Western Dakota could independently lease or sell hydraulic catwalks. After execution of the Manufacturing Agreement, Ace provided Western Dakota with the confidential information necessary to manufacture the HydraCat.

From April 2013 to November 2014, Western Dakota operated within the terms of the Manufacturing Agreement and supplied Ace with ten HydraCats. But then the relationship soured. In early November 2014, Ace was involved in negotiations with Consolidated Wellsite Services, LLC ("Consolidated") for the purchase of a HydraCat, when Consolidated abruptly abandoned the transaction. Ace subsequently learned that Western Dakota had sold a HydraCat directly to Consolidated at a lower price without providing notice to Ace or obtaining its consent. Ace also learned that Western Dakota sold a HydraCat directly to Continental Industries Services, LLC ("Continental") without Ace's permission or knowledge. Additionally, at some point, Western Dakota started advertising the sale of HydraCats "direct from the manufacturer" on its website.

On May 13, 2015, Ace commenced this lawsuit against Western Dakota, Mr. Pankowski, and Mr. Kerkvliet. On March 24, 2016, while the lawsuit was pending, Mr. Pankowski and two other individuals formed WesDak, a South Dakota limited liability company that, like Western Dakota, provided welding and manufacturing services. Several days later, Mr. Kerkvliet executed Articles of Termination Dissolving Western Dakota. Mr. Kerkvliet also signed a Bill of Sale identifying items of personal property that Western Dakota was transferring to WesDak and executed a Warranty Deed transferring Western Dakota's real property to WesDak. Mr. Pankowski, on behalf of WesDak, and Mr.

Kerkvliet, on behalf of Western Dakota, then executed an Asset Purchase Agreement. The Asset Purchase Agreement provided that WesDak would acquire Western Dakota's assets in exchange for the amount necessary to re-finance a loan made to Western Dakota. The Asset Purchase Agreement failed to disclose Ace's claim against Western Dakota. After the asset transfer, WesDak continued to operate in the same location and use the same equipment that Western Dakota previously used. WesDak also continued to advertise the HydraCat for sale using the same website previously associated with Western Dakota. Although not an owner of WesDak, Mr. Kerkvliet was listed as an approved cardholder on WesDak's credit card application. Notably, Mr. Kerkvliet received no compensation or consideration in exchange for his 51% interest in Western Dakota.

On July 25, 2016, shortly after dissolving Western Dakota and forming WesDak, Mr. Pankowski and Mr. Kerkvliet filed for Chapter 13 bankruptcy protection in the United States Bankruptcy Court for the District of South Dakota. In testimony given in connection with his bankruptcy case, Mr. Kerkvliet admitted that the only reason he filed for bankruptcy protection was to stop the instant lawsuit. The bankruptcy court denied Mr. Pankowski and Mr. Kerkvliet a discharge in their respective bankruptcy cases [Doc. No. 81].

Ace then filed an Amended Complaint [Doc. No. 83] asserting sixteen claims and naming Western Dakota, WesDak, Mr. Pankowski, and Mr. Kerkvliet as defendants. Only Mr. Kerkvliet filed an Answer. A Clerk's Entry of Default was entered against Western Dakota on January 17, 2017, and a Default Judgment and Order of Injunction was entered on September 6, 2017 [Doc. Nos. 68, 75]. A Clerk's Entry of Default was also entered

against Mr. Pankowski and WesDak on May 4, 2020 [Doc. No. 82].

## DISCUSSION

Ace seeks partial summary judgment against Mr. Kerkvliet as to its claims for misappropriation of trade secrets, conversion, tortious interference, fraud, civil conspiracy, piercing the corporate veil, and fraudulent transfer. As explained below, Ace is entitled to judgment as a matter of law on only some of these claims.

### I.   Misappropriation of Trade Secrets Claim

To succeed on its misappropriation of trade secrets claim, Ace must show (1) the existence of a trade secret; (2) misappropriation; and (3) use of the trade secret to the plaintiff's detriment. *MTG Guarnieri Mfg., Inc. v. Clouatre*, 239 P.3d 202, 209 (Okla.Civ.App. 2010). As to the first element, the Oklahoma Uniform Trade Secrets Act, Okla. Stat. tit. 78 §§ 85, *et seq*. ("OUTSA"), defines a trade secret as information that

> a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Okla. Stat. tit. 78, § 86(4).

Ace asserts that its customer lists and the HydraCat's technical specifications qualify as trade secrets under this definition. The Court agrees. Ace has provided evidence showing that this information is not generally known within the oil and gas industry and that Ace took steps to protect its confidentiality by requiring persons with access to the information to execute an agreement prohibiting its disclosure or improper use. Further,

the confidential information has an independent economic value because its disclosure would provide Ace's competitors with the specialized knowledge necessary to manufacture and market the HydraCat.

Ace has also shown that the information was misappropriated by Mr. Kerkvliet to Ace's detriment. Misappropriation occurs when a person uses a trade secret without consent and the person knew the trade secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id*. at § 86(2)(b). There is no dispute that Mr. Kerkvliet only gained knowledge of the trade secrets after he executed the Manufacturing Agreement, which required Western Dakota and its employees to maintain the confidentiality of the information. Mr. Kerkvliet then misappropriated the information by using it to sell HydraCats to Ace's customers without consent, which resulted in lost profits to Ace. *See Musket Corp. v. Star Fuel of Oklahoma, LLC*, 606 F. App'x 439, 452 (10th Cir. 2015) (unpublished) (finding breach of nondisclosure agreement sufficient to show misappropriation). Ace has demonstrated that its trade secrets were misappropriated by Mr. Kerkvliet, and it is therefore entitled to summary judgment on its misappropriation of trade secrets claim.

## II. Conversion Claim

Under Oklahoma law, a conversion involves an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Am. Biomedical Grp., Inc. v. Techtrol, Inc*., 374 P.3d 820, 825 (Okla. 2016) (citation omitted). Ace broadly alleges that Mr. Kerkvliet converted "tangible and intangible property" to his own use including money from sales of the HydraCat, inventory

and other physical property of Ace, drawings and information related to the HydraCat, and Ace's confidential information. Am. Compl. ¶ 66. However, the conversation of intangible property, including the right to recover money, is not generally recognized in Oklahoma. *Id.*; *Shebester v. Triple Crown Insurers*, 826 P.2d 603, 608 (Okla. 1992); *AG Equip. Co. v. AIG Life Ins. Co.*, No. 07-CV-0556CVEPJC, 2008 WL 4570319, at *5 (N.D. Okla. Oct. 10, 2008). Accordingly, Ace's claim for conversion of intangible property is not viable.

Further, a claim under the OUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Okla.Stat.tit. 78, § 92. Thus, to the extent Ace's conversion claim seeks recovery for the misuse of trade secrets, that portion of the claim is displaced by the OUTSA. *See JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found.*, No. 20-CV-35-GKF-SH, 2021 WL 2371233, at *8 (N.D. Okla. June 9, 2021) (dismissing conversion claim to the extent it also alleged conversion of trade secrets); *CTI Servs. LLC v. Haremza*, 797 F. Supp. 2d 1257, 1261 (N.D. Okla. 2011) (same).

The remainder of Ace's conversion claim is not displaced because it is directed towards inventory and other physical property that does not depend on the property's trade secret status. *See Craig Neon, Inc. v. McKenzie*, 25 F. App'x 750, 752 (10th Cir. 2001) (unpublished) (explaining that the OUTSA "does not apply to 'civil remedies that are not based upon misappropriation of a trade secret.'"). On this portion of its conversion claim, Ace succeeds. Specifically, Ace presented undisputed facts showing that it owned any HydraCats manufactured by Western Dakota, that Western Dakota interfered with Ace's right to control the HydraCats by surreptitiously selling them to Ace's customers, and that

Ace suffered lost profits as a result. Mr. Kerkvliet, as the majority owner and joint operator of Western Dakota, is responsible for this tortious conduct. *See Clouatre*, 239 P.3d at 214 (explaining that manager of an LLC is personally liable for intentional misconduct). Application of the undisputed facts to the applicable law compels Ace's entitlement to judgment as a matter of law on this portion of the claim. Accordingly, Ace is entitled to summary judgment on the portion of its conversion claim directed at tangible property not qualifying as a trade secret.

### III.   Tortious Interference

Ace argues that Mr. Kerkvliet is liable for tortious interference on two distinct grounds: tortious interference with a contractual or business relationship and tortious interference with prospective economic advantage. Although these claims are "extremely similar, they are recognized as distinct torts." *Loven v. Church Mut. Ins. Co.*, 452 P.3d 418, 425 (Okla. 2019). The main difference between these torts is that the former involves interference with an existing contract or business relationship while the latter involves interference with a prospective contract. *See Fulton v. People Lease Corp.*, 241 P.3d 255, 263 (Okla. Civ. App. 2010).

In seeking summary judgment on the tortious interference with contract or business relationship claim, Ace relies on its disrupted negotiations with Consolidated for the purchase of a HydraCat. But Ace points to no authority suggesting that the mere potential for a sale qualifies as an "existing business right." *Wilspec Techs., Inc. v. DunAn Holding Grp., Co.*, 204 P.3d 69, 74 (Okla. 2009). Ace has not presented evidence showing that it had an ongoing business relationship with Consolidated or that Consolidated was under

any sort of commitment to purchase a HydraCat. *See Shattuck Pharmacy Mgmt., P.C. v. Prime Therapeutics, LLC*, No. CIV-21-0221-F, 2021 WL 2667518, at *8 (W.D. Okla. June 29, 2021) (finding no contractual or business right between pharmacy and customers because customers were "free to go elsewhere"); *Bradshaw v. Uber Techs., Inc.*, No. CIV-16-388-R, 2017 WL 2455151, at *3 (W.D. Okla. June 6, 2017) (finding no business right to a gratuity between riders and ride sharing service). Accordingly, Ace has not shown that it had a right to the sale and its claim for tortious interference with contract or business relationship fails.

Ace, however, also asserts that the undisputed facts make clear that Mr. Kerkvliet interfered with Ace's prospective economic advantage with respect to Consolidated and Continental. A claim for tortious interference with prospective economic advantage involves four elements:

> 1.) the existence of a valid business relation or expectancy;
> 2.) knowledge of the relationship or expectance on the part of the interferer;
> 3.) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and
> 4.) resultant damage to the party whose relationship has been disrupted.

*Loven*, 452 P.3d at 425. An "intentional interference" requires a showing of bad faith and is defined to include "inducing a third person not to enter into the prospective relation or preventing the other party from acquiring the prospective relation." *Id.* Further, "[t]he interference must be the purpose of the tortfeasor's act, and their motive must include a desire to interfere and disrupt the others' prospective economic business advantage." *Id.*

There is no dispute that Ace had an existing business expectancy with respect to Consolidated and Continental as they were both prospective buyers of the HydraCat. There

9

is also no dispute that Mr. Kerkvliet knew this information and used his knowledge to sell a HydraCat directly to Ace's prospective customers at a lower price, thereby preventing Ace from acquiring these sales. As the person who executed the Manufacturing Agreement, Mr. Kerkvliet also knew these sales were in direct violation of the agreement. This knowing and flagrant violation of the Manufacturing Agreement shows a degree of bad faith and establishes that the interference was intentional. Further, the interference proximately damaged Ace, because it lost the profits it would have realized had it been able to complete sales to Consolidated or Continental. Accordingly, Ace is entitled to summary judgment with respect to its claim for tortious interference with prospective business relations.

## IV.    Fraud

To succeed on its fraud claim,[1] Ace must show "(1) a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage." *Key Fin., Inc. v. Koon*, 371 P.3d 1133, 1137 (Okla. Civ. App. 2015). Actual fraud can include a "promise made without any intention of performing it" or "[a]ny other act fitted to deceive." Okla. Stat. tit. 15, § 58. Importantly, however, where fraud is premised on a promise as to some future performance, it is not enough to simply show that the promise went unfulfilled. Instead, there must be evidence that the promise was "accompanied by an intention not to perform"

---

[1] Although some of the facts underlying Ace's fraud claim overlap with its misappropriation of trade secrets claim, the fraud claim is not displaced by the OUTSA because the fraud claim does not depend on a finding that any information was a trade secret. *See Craig Neon, Inc.*, 25 F. App'x at 752 (finding that plaintiff's fraud claim was not displaced by misappropriation of trade secrets claim because fraud claim could succeed even without proving that the information was a trade secret).

10

and "made with the intent to deceive." *Roberts v. Wells Fargo AG Credit Corp.*, 990 F.2d 1169, 1172 (10th Cir. 1993) (quoting *Citation Co. Realtors, Inc. v. Lyon*, 610 P.2d 788, 790 (Okla.1980)). Further, "[a]ctual fraud is always a question of fact[,]" Okla. Stat. tit. 15, § 60, and it must be shown by clear and convincing evidence.[2] *Derakhshan v. Tizzio*, 270 P.3d 215, 217 (Okla. Civ. App. 2011).

Ace claims that Mr. Kerkvliet acted fraudulently by surreptitiously selling two HydraCats to Ace's customers after he executed a Manufacturing Agreement where he promised to maintain Ace's confidential information and not compete with Ace. Western Dakota did indeed violate its contractual promises when it sold HydraCats without Ace's permission. However, the mere fact that Western Dakota may have breached the contract is not enough to show that Mr. Kerkvliet intended not to perform at the time the promises were made. In fact, Western Dakota produced ten HydraCats for Ace over several months within the terms of the Manufacturing Agreement, which strongly suggests that Mr. Kerkvliet intended to comply with the agreement when it was executed. The only evidence Ace offers in support of its claim is that Western Dakota breached the Manufacturing Agreement when it sold HydraCats and advertised the HydraCat for sale on the Western Dakota website. But these actions occurred well after Mr. Kerkvliet executed the Manufacturing Agreement and do not show that his contractual promises were initially

---

[2] Although Ace need not prove its fraud claim by clear and convincing evidence at the summary judgment stage, the Court "'must view the evidence presented through the prism of the substantive evidentiary burden.'" *Pine Tel. Co. v. Alcatel Lucent USA Inc.*, 617 F. App'x 846, 859 (10th Cir. 2015) (unpublished) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

11

accompanied by an intention not to perform. *See Pine Tel. Co. v. Alcatel Lucent USA Inc.*, 617 F. App'x 846, 859 (10th Cir. 2015) (unpublished) (affirming summary judgment to defendant on fraud claim under Oklahoma law where plaintiff failed to present evidence that defendant knew it could not perform contractual duties); *Showler v. Harper's Mag. Found.*, 222 F. App'x 755, 765 (10th Cir. 2007) (unpublished) (affirming summary judgment to defendant on fraud claim under Oklahoma law where plaintiff failed to present evidence of defendant's intent at the time he made the promise); *Citation Co. Realtors v. Lyon*, 610 P.2d 788, 790 (Okla. 1980) (finding no fraud where defendant made an attempt to perform under the contract and explaining that "[t]here is a wide distinction between the nonperformance of a promise and a promise made mala fide"). Ace has failed to come forward with evidence showing that Mr. Kerkvliet's representations were known to be false when made and summary judgment on Ace's fraud claim is therefore denied.

### V.   Civil Conspiracy

Ace next asserts that Mr. Kerkvliet engaged in a civil conspiracy with Mr. Pankowski, Western Dakota, and WesDak to "use Ace's Confidential Information to surreptitiously manufacture and sell HydraCats." Pl.'s Br. 32. A "civil conspiracy itself does not create liability." *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997). Rather, to be liable for civil conspiracy "the conspirators must pursue an independently unlawful purpose or use an independently unlawful means." *Id.*

Ace bases its civil conspiracy claim entirely on Defendant's misappropriation of Ace's trade secrets. *See* Pl.'s Br. 32 (stating that "Defendants were well aware that Ace protected its Confidential Information as a highly confidential trade secret" and that

"Defendants had a duty to maintain Ace's Confidential Information as a confidential trade secret."). Because Ace's civil conspiracy claim is based on Mr. Kerkvliet's misappropriation of trade secrets, it is entirely displaced by Ace's misappropriation of trade secrets claim. *See* part I, *supra*; *see also Oklahoma Land Holdings, LLC v. BMR II, LLC*, No. CIV-17-1036-D, 2020 WL 4284806, at *14 (W.D. Okla. July 27, 2020) (finding civil conspiracy claim displaced by misappropriation of trade secrets claim). Summary judgment on this claim is therefore denied.

## VI.   Piercing the Corporate Veil

Ace next seeks to hold Mr. Kerkvliet personally liable for the actions of Western Dakota and WesDak[3] through the doctrine of piercing the corporate veil. Oklahoma[4] permits courts to "disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." *Fanning v. Brown*, 85 P.3d 841, 846 (Okla. 2004). Here, Ace relies on a fraud theory to argue that the corporate veil of Western Dakota and WesDak should be disregarded. To succeed on this claim, Ace must show that the separate corporate existence of Western Dakota and WesDak "is a design or scheme to perpetrate fraud." *Gulf Oil Corp. v. State*, 360 P.2d 933,

---

[3] Western Dakota and WesDak are organized as LLCs, not corporations, but the doctrine of piecing the corporate veil applies equally to LLCs. *Mattingly L. Firm, P.C. v. Henson*, 466 P.3d 590, 595 (Okla. Civ. App. 2020).

[4] Although Western Dakota and WesDak are organized under South Dakota law, Ace applies Oklahoma law to its piercing the corporate veil argument. As Mr. Kerkvliet does not challenge the application of Oklahoma law, the Court assumes Oklahoma law is applicable.

13

936 (Okla. 1961).

To make this showing, Ace notes that Mr. Kerkvliet and Mr. Pankowski extinguished Western Dakota after this lawsuit was filed. Mr. Pankowski and two other individuals then formed WesDak, which acquired Western Dakota's assets and operated without interruption from the same location and with the same equipment. WesDak also continued to advertise the HydraCat for sale from the website that was previously associated with Western Dakota. Although Mr. Kerkvliet is not a member of WesDak, he is listed as an approved cardholder on WesDak's credit card application, suggesting he maintains at least some association or interest in the company. Further, despite being the majority owner of Western Dakota, he did not receive any compensation in exchange for relinquishing his share of the company to WesDak.

This evidence suggests that WesDak was formed as part of a scheme to deplete the assets of Western Dakota and prevent Ace from recovering a judgment. In a similar vein, in testimony made in connection with his bankruptcy case, Mr. Kerkvliet admitted that the only reason he filed for bankruptcy was to stop this litigation. The fact that these activities were specifically intended to thwart Ace's recovery further indicates that it is appropriate to pierce the corporate veil of Western Dakota and WesDak. *See King v. Mod. Music Co.,* 33 P.3d 947, 953 (Okla. Civ. App. 2001) (noting importance of showing a fraudulent scheme directed at the plaintiffs).

Ace has shown that Western Dakota and WesDak attempted to use their corporate existence to engage in a fraudulent scheme to avoid judgment in this action. Accordingly, the Court finds that it is appropriate to disregard the corporate status of Western Dakota

and WesDak and hold Mr. Kerkvliet personally liable.

**VII.   Fraudulent Transfer**

Lastly, Ace contends that Mr. Kerkvliet is liable for a fraudulent transfer under Oklahoma's Uniform Fraudulent Transfer Act ("OUFTA"), Okla. Stat. tit. 24 § 112, *et seq*. Section 116 of the OUFTA provides that

> A. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> 1. with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> 2. without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or
>>
>> b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

*Id.* at § 116(A). As Ace points out, the requirements of § 116(A)(2) are met because there is no dispute that Mr. Kerkvliet relinquished his share of Western Dakota in exchange for no consideration and that he made the transfer during the pendency of this lawsuit.

As for whether the requirements of § 116(A)(1) are met, the statute provides that the following factors may be considered when determining whether there was "actual intent" to make a fraudulent transfer:

> 1. the transfer or obligation was to an insider;
> 2. the debtor retained possession or control of the property transferred after

> the transfer;
> 3. the transfer or obligation was disclosed or concealed;
> 4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> 5. the transfer was of substantially all the debtor's assets;
> 6. the debtor absconded;
> 7. the debtor removed or concealed assets;
> 8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> 9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> 10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> 11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* at §116(B). Several of these factors are present here. For example, Mr. Kerkvliet made the transfer to an insider, the transfer was concealed, the transfer was made after he had been sued by Ace, and the transfer consisted of a significant portion of Mr. Kerkvliet's assets. Further, Mr. Kerkvliet filed for Chapter 13 bankruptcy shortly after the transfer and admitted that the bankruptcy case was initiated to hinder the instant lawsuit. Accordingly, Ace has come forward with sufficient evidence showing that Mr. Kerkvliet violated the OUFTA when he relinquished his share of Western Dakota to WesDak without receiving any consideration or compensation, and is entitled to judgment as a matter of law on this claim.

## CONCLUSION

For the reasons explained above, Plaintiff's Motion for Partial Summary Judgment [Doc. No. 110] is GRANTED in part and DENIED in part, as detailed herein.

IT IS FURTHER ORDERED that any unexpired pretrial filing deadlines shall

commence thirty days from the date of this Order and proceed as set out in the original Scheduling Order [Doc. No. 94].

    IT IS SO ORDERED this 5th day of October, 2021.

                                            TIMOTHY D. DeGIUSTI
                                            Chief United States District Judge